IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  06-0782-CV-W-NKL |
| MIDWESTERN GENERAL BROKERAGE, INC., d/b/a/ WESTROPE & ASSOCIATES, | ) ) ) ) | |
| Defendant. | ) ) | |

ORDER

In 2003, Brenda Sieckman ("Sieckman") filed a wrongful death suit is Missouri

state court against Interstate Brands Corporation ("IBC") when her husband, Mark, was

electrocuted on IBC's property.  Sieckman won a jury verdict in the amount of

$9,750,500, for which IBC's primary insurance carrier, Discover Property & Casualty

Insurance Company ("Discover"), paid the limits of its policy, $1,500,000.  IBC appealed

the verdict, but while the appeal was pending, Sieckman settled her suit with IBC and

IBC's umbrella insurance carrier, Plaintiff National Union Fire Insurance Company of

Pittsburgh, PA ("National Union").  Although IBC had a Self Insurance Retention[1] of

$1,000,000 on the Discoverpolicy, it filed for bankruptcy and paid nothing to Sieckman

---

[1]A Self Insured Retention, or SIR, is an amount which an insured is responsible for paying itself
before it makes any claims against its insurance policies.

1

except to assign her the proceeds of any negligence claim it might have against Defendant

Western General Brokerage, Inc., d/b/a Westrope & Associates ("Westrope"), the broker

that procured the National Union umbrella policy. Although Discover paid $1,500,000

and National Union paid $5,000,000 to settle the suit, there was a $1,000,000 gap

between their coverages because National Union was under the misapprehension that the

Discover policy had $2,500,000 in coverage instead of $1,500,000. National Union

agreed to pay that $1,000,000 coverage gap itself as part of its $5,000,000 settlement and

now seeks to recover the same amount from Westrope, whom it believes was negligent in

allowing the gap in coverage to arise.

Pending before the Court are National Union's Motion to Bar the Expert Report of

Horst Lechler and Bar Him from Testifying at Trial [Doc. # 42] and its Motion for

Summary Judgment [Doc. # 44]. Also pending before the Court are Westrope's Motion

to Exclude Expert Testimony of Roger Simpson and Scott B. Lakin [Doc. # 46] and its

Motion for Summary Judgment [Doc. # 47]. For the reasons set forth below, National

Union's Motion for Summary Judgment is denied and all three other motions are granted.

## I.     Motions to Strike/Exclude

### A.  National Union's Motion to Bar Report and Testimony of Horst Lechler

Westrope's expert, Horst Lechler, filed a one page expert report in which he states

the following opinion:

> It is my opinion based on my review of the documents that Westrope
> fulfilled all duties it owed [IBC] and National Union. Westrope [sic] actions
> as a wholesale intermediary were reasonable and sufficiently diligent to

2

> meet the standard of care expected of an intermediary in the placement of umbrella liability coverage.

> Westrope was not negligent in any of its actions and dealings with [IBC] or National Union. It fulfilled all reasonable expectations.

Pl. Sugg. Ex. A. Although Lechler also states that he has reviewed documents NU0001 to NU00458 produced by National Union and documents 000001 to 000828 produced by Westrope, he does not explain how or why these documents have led him to determine that Westrope was not negligent. Fed R. Civ. P. 26(a)(2)(B) requires that an expert's report include the "basis and reasons" for his opinions in addition to including the "the data or other information considered by the witness in forming the opinions." Lechler complied with the latter but not the former.

The Eighth Circuit has explained that the reason for requiring expert reports is "the elimination of unfair surprise to the opposing party and the conservation of resources" by not having to conduct lengthy depositions of experts. *Sylla-Sawdon v. Uniroyal Goorich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995). "A party that without substantial justification fails to disclose information required by Rule 26(a) … is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). The availability of this sanction is what "put[s] teeth into the rule" of expert disclosures. *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998).

Lechler's opinions are little more than conclusory statements asserting that Westrope did not breach any duty to National Union. Although he identified over 1,000

3

documents he reviewed, he has offered no explanation as to how or why such documents resulted in his conclusions. As he has failed to comply with the requirements of Rule 26(a)(2)(B), the Court strikes Lechler's report under Rule 37(c)(1).

### B. Westrope's Motion to Exclude Expert Testimony of Scott Lakin

National Union produced reports from two experts, Roger Simpson and Scott B. Lakin, which Westrope challenges on *Daubert* grounds. Since the Motion to Exclude was filed, National Union has withdrawn Simpson's report and no longer intends to call him to testify; however, it continues to rely on Lakin's report.

Under Fed. R. Evid. 702, an expert may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." If a party intends to use such expert testimony at trial, it must disclose a report from that expert detailing his opinions and the bases therefor. Fed. R. Civ. P. 26(a)(2)(B). While National Union produced such a report from Lakin, the opinions contained within it are not proper expert testimony.

In his initial report, Lakin offers five opinions. The first explains what an insurance broker does and who qualifies as such, while the rest state that Westrope owed certain duties to both National Union and IBC. What duties are owed by whom and to whom are questions of law. *See Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. 2005) ("Whether a duty exists is purely a question of law."); *Southern Pine Helicopters,*

4

*Inc. v. Phoenix Aviation Managers, Inc*., 320 F.3d 838, 841 (8th Cir. 2003) ("expert

testimony on legal matters is not admissible").  National Union states that Lakin misspoke

when he used the word "duty" and that his intent was merely to state what is customary

practice for insurance brokers.  That is a stretch since, among other opinions, he says an

insurance broker owes an insurer a duty of good faith and fair dealing, a legal term of art.

In his supplemental report, Lakin offers additional opinions as to Westrope's internal

policy manual.  After describing what the manual says, Lakin claims that "their

procedures manual creates duties and obligations not just internally to management but

externally to insurers, brokers, and policy holders."  Again, this is a legal conclusions and

beyond the province of expert testimony.  Westrope's Motion to Exclude Expert

Testimony is therefore granted as to Lakin and denied as moot as to Simpson.

## II.     Factual Background

A reasonable juror could find the following facts in favor of National Union.[2]

In April 2003, IBC's retail insurance broker, Lockton Companies, Inc. ("Lockton"), asked

Westrope, an independent wholesale insurance broker,  to solicit bids for umbrella

coverage for IBC for the 2003-2004 year.  To further the solicitation, Lockton prepared

and provided to Westrope a package of materials (known as a "submission").  The

submission identified both the primary and the umbrella coverage IBC desired.  Westrope

employee Mark English, a licensed Missouri Excess and Surplus Lines broker, received

---

[2]Because the Court grants Westrope's Summary Judgment Motion, it views all facts in the light
most favorable to National Union as the party resisting Westrope's Motion.  The Court need not
view facts in a light favorable to Westrope to resolve National Union's concurrent Motion for
Summary Judgment as Westrope's Motion must be granted as a matter of law.

5

the submission from Lockton employee Becky Maas and had it forwarded to numerous excess insurers, including National Union, with a request that they submit proposals stating the terms upon which they would offer umbrella coverage to IBC. National Union had previously provided IBC coverage and was the incumbent umbrella carrier on the expiring policy.

At the same time, IBC's primary insurance policy was set to expire and its provider, Kemper, was leaving the market. Thus, even though the submission from Westrope referred to Kemper as the primary insurer, National Union was aware that the primary insurer would change. The limit for general liability coverage on IBC's expiring primary policy was $2,500,000 with a deductible of $1,000,000. As the incumbent umbrella coverage provider, National Union was aware of these limits. When Lockton solicited Discover as a replacement primary carrier for Kemper, Discover initially quoted the same terms as the Kemper policy: a per occurrence limit of $2,500,000 with a $1,000,000 deductible. At some point, however, Discover modified its offer to replace the $1,000,000 deductible with a $1,000,000 Self Insured Retention or SIR. The import of this change was that Discover's original proposal (and Kemper's expiring policy) provided $2,500,000 in coverage above and beyond the $1,000,000 deductible IBC would have to pay itself to trigger coverage. By contrast, Discover's modified proposal provided a limit of $2,500,000 in coverage and the $1,000,000 Self Insured Retention would be deducted from that coverage. Under the modified policy, the most Discover

6

would pay out on a given claim was $1,500,000 rather than $2,500,000 because the first

$1,000,000 of any given claim had to be paid by IBC itself.

On May 19, 2003 Becky Maas of Lockton sent Mark English of Westrope an

e-mail conveying the "final primary numbers for the primary on IBC" as follows:

> General Liability (Discover Re)
> Limits $2.5M/$5M   General Aggregate
> Self Insured Retention         $1,000,000 (This was previously a deductible)

Westrope forwarded a copy of Maas' May 19 e-mail to National Union the following day.

On May 21, National Union employee John Gottschall responded with the following e-

mail:

> Thanks for the primary figures. It would be great if you could forward a
> copy of the primary quote as soon as you receive it so we can see the limit
> structure and the terms & conditions. One question blares-out; you say the
> $1m GL deductible is now an SIR. Does that mean the GL limit of
> $2.5m/$5m is above the $1m SIR, does the SIR have an aggregate?

Gottschall's e-mail was forwarded to Maas by another Westrope employee, Gemma

Finken, with a  note that read, "Please advise. Need copy of Primary Quote."  Maas

responded to Finken by stating that "the limit on the GL is above the SIR. There is no

aggregate on the SIR. I will email primary quotes under a separate email."

The following day, May 22, Maas sent Finken and English a copy of Discover's

initial proposal, stating that "their quote shows a deductible, but that has been changed to

an SIR, so I have attached a copy of my email showing the [final] order."  Finken

immediately forwarded Maas's email along with its attachments to National Union.

Thus, National Union had a copy of the final Discover proposal by May 22, which

7

referenced $2,500,000 policy limits and a $1,000,000 Self Insured Retention (as opposed

to a deductible). When the policy was actually written up, it showed a policy coverage of

$1,500,000 over a $1,000,000 SIR for the 2003-2004 policy year.

On June 5, National Union e-mailed a quote to Westrope for IBC's umbrella

coverage for the 2003-2004 policy year. Westrope plugged the quoted figures into a form

called a "Renewal Insurance Quotation," which it sent to Lockton to be reviewed by IBC.

The Renewal Insurance Quotation contained the following caveat:

> THIS PROPOSAL IS BASED ON THE UNDERWRITING AND
> RATING INFORMATION IN YOUR APPLICATION OR PROVIDED
> BY YOU. THE COVERAGE AND TERMS BEING OFFERED MAY
> NOT BE THE SAME OR AS BROAD AS REQUESTED IN YOUR
> APPLICATION. PLEASE REVIEW CAREFULLY AND ADVISE US
> IMMEDIATELY IF YOU HAVE ANY QUESTIONS.
>
> COVERAGE IS NOT EFFECTED BY THIS QUOTATION AND MAY
> BE RENDERED ONLY BY AN AUTHORIZED REPRESENTATIVE OF
> THE INSURER.

In an e-mail dated June 12, 2003, Westrope advised National Union it had received an

order from IBC to bind umbrella coverage from National Union. National Union issued

and e-mailed to Westrope its binder providing coverage to IBC the same day. Westrope

converted the information in the binder onto its own forms and forwarded the policy on to

Lockton.

On July 15, 2003, Mark Sieckman was electrocuted on IBC's property, prompting

his wife to sue for wrongful death. While the case was pending, the parties discovered a

$1,000,000 coverage gap between the primary coverage provided by Discover and the

umbrella coverage provided by National Union. Although both the Kemper and Discover

policies required IBC to pay the first $1,000,000 of any claim, the Kemper policy had covered the next $2,500,000 (up to $3,500,000 in damages) while the Discover policy only covered claims up to $2,500,000 including the $1,000,000 SIR. Put simply, the new Discover policy paid out $1,000,000 less than the old Kemper policy. National Union's umbrella policy covered damages in excess of $3,500,000 since, under the Kemper policy, that's where the primary coverage was capped. Under the new Discover policy, however, primary coverage was capped at $2,500,000 but National Union's umbrella coverage didn't start until damages per occurrence exceeded $3,500,000. Hence, the $1,000,000 gap in coverage.

While the wrongful death case was pending, IBC filed for bankruptcy. To get relief from the automatic stay imposed by the Bankruptcy Court and proceed with her wrongful death claim, Brenda Sieckman released, waived, and discharged any damages recoverable against IBC that were not covered by insurance. She also filed a separate declaratory judgment action to determine who was responsible for the coverage gap. On July 15, 2005, a jury returned a verdict in her favor in the wrongful death suit in the amount of $9,750,500, for which Discover paid the limits of its policy, $1,500,000. Pending appeal of the wrongful death verdict, both that case and the declaratory judgment action were compromised and settled by National Union and IBC. National Union paid Sieckman $5,000,000–purportedly including the $1,000,000 gap–and IBC assigned to Sieckman the proceeds of any negligence claim it might have against Westrope for the gap. In exchange, Siechman released the unpaid balance of the $9,750,500 judgment and

9

reassigned IBC's rights to any claim against Westrope to National Union. IBC, therefore, sustained no loss in settling the cases other than assigning any potential claims it had against Westrope to Sieckman.

## III.    Discussion

National Union brings this two count negligence suit against Westrope. In Count I, National Union claims that it was damaged by Westrope's negligence in soliciting an umbrella policy with a $1,000,000 gap. In Court II, National Union asserts IBC's own claims for negligence against Westrope for the same gap by virtue of the assignment of such claims from IBC to Sieckman and then from Sieckman to National Union. Both claims fail as a matter of law.

### A.    Negligence against National Union

Under Missouri law, a plaintiff suing for negligence must establish: "1) the existence of a duty by the defendant to protect the plaintiff from injury; 2) failure of the defendant to perform that duty; and 3) injury to the plaintiff resulting from the defendant's failure." *Doyle v. Fluor Corp.*, 199 S.W.3d 784, 789 (Mo. Ct. App. 2006). National Union cannot succeed in its claim for negligence against Westrope because it cannot establish that Westrope owed it any duty.

It is a general principle of insurance law that "an insurance broker is ordinarily the agent of those for whom insurance is procured . . . and owes a duty to [that] client to act with reasonable care, skill, and diligence." *A.G. Edwards & Sons v. Drew*, 978 S.W.2d 386, 394-395 (Mo. Ct. App. 1998); *see also Weekly v. Missouri Property Ins. Placement*

10

*Facility*, 538 S.W.2d 375, 379 (Mo. Ct. App. 1976) ("an insurance broker is generally the agent of those for whom insurance is procured").  There are rare occasions when a broker "may be the agent of the insurer for a certain purpose and of the insured for another purpose." *Electro Battery Mfg. Co. v. Commercial Union Ins*. Co., 762 F. Supp. 844, 848 (E.D. Mo. 1991).  "For example, the broker acts for the insured for the purpose of making the application and procuring the policy, and for the insurer for the purpose of collecting and remitting the premiums and delivering the policy." *Id.*  However, "[a]bsent some special condition or circumstance in a particular case [an insurance broker] is not the agent of the insuror; and he may not be converted into an agent for the insurance company without some action on the part of the company." *Travelers Indem. Co. v. Beaty*, 523 S.W.2d 534, 538 (Mo. Ct. App. 1975).

National Union has offered the Court no authority which stands for the proposition that a broker who procures a policy from an insurer is an agent for, or otherwise owes any duty to, that insurer with regard to gaps in coverage.  Such gaps may and frequently do give rise to negligence claims by the insured.  *See, e.g., Electro Battery*, 762 F. Supp. a 847 ("It is clear that [the broker], not [the insurer], is at fault for the gap in coverage.") But the Court is unaware of any precedent placing a duty on a broker to protect the insurer from such gaps; nor is the Court aware of how such a gap could even damage the insurer as opposed to the insured.  National Union attempts to create such a duty through the inadmissible testimony of an expert but, as the Court has explained above, the

existence of a duty is a question of law for the Court to decide and not a proper subject for expert testimony.

National Union also tries to establish the existence of a duty by referring to Westrope's internal policy manuals. Again, it is unclear how internal procedures and guidelines used by a brokerage firm could give rise to any expectation of performance or protection by someone outside the firm who had no knowledge of them. If there are cases which stand for such a proposition, they have not been found by the Court and have not been cited by National Union. Finally, National Union cites deposition testimony in which Mark English, a Westrope representative, admitted to being a "mailman" between National Union and Lockton. It is unclear how transferring documents between an insurer and a retail broker would give rise to a duty to protect an insurer from coverage gaps. Once again, National Union offers no precedent to support its position.

Even assuming that National Union could establish that it was owed a duty by Westrope, the evidence does not support a finding that National Union was damaged by the breach of such a duty. Although the insurer settled Sieckman's claim for $5,000,000, which purportedly included the $1,000,000 coverage gap, the compromised judgment was for $9,750,500. Assuming that no coverage gap existed and Discover had paid out a full $2,500,000 on top of IBC's $1,000,000 SIR, National Union would still have been on the hook for the remaining balance of $6,250,500. Settling the claim and "assuming responsibility" for the gap in coverage therefore saved National Union $1,250,500. It is hard to find any injury in that equation.

Because Westrope owed no duty to National Union, and further because National Union has not proved any injury, its negligence claim against Westrope fails as a matter of law. Westrope is entitled to summary judgment on Count I.

**B. IBC's Assigned Claims**

The parties debate whether National Union has standing to assert IBC's claims given Missouri's public policy against the assignment of personal injury damages. "A tort claim in which the wrong is regarded as one to the person rather than an injury affecting the estate or property is not assignable." *Lehman v. UPS*, 443 F. Supp. 2d 1146, 1153 (W.D. Mo. 2006); *compare Freeman v. Basso,* 128 S.W.3d 138, 142 (Mo. App. 2004) (holding "legal malpractice claims are not now and have never been assignable" in Missouri) *with Beall v. Farmers' Exchange Bank*, 76 S.W.2d 1098, 1099 (Mo. 1934) (holding that "a right of action for fraud or deceit is . . . assignable where the injury is regarded as affecting the estate, or as arising out of contract.") In any event, the Court need not decide whether the assignment of IBC's negligence claims to National Union is more like a personal injury or an injury affecting property because, in either case, National Union has offered no evidence that IBC was damaged by Westrope's negligence.

IBC filed for bankruptcy after Sieckman filed her wrongful death suit, which placed an automatic stay on that proceeding. In order to advance her case, Sieckman waived any and all claims against IBC which were not covered by insurance. Assuming that Westrope's negligence was the cause of the $1,000,000 coverage gap, the gap–by

Case 4:06-cv-00782-NKL   Document 74   Filed 05/23/07   Page 13 of 15

definition–represents a portion of the injury not covered by insurance and was therefore released by Sieckman. But even if the Court were to assume that her release did not waive the claim for the gap, IBC suffered no damage due to the gap: it suffered no loss with regard to the wrongful death claim or the settlement while that claim was pending on appeal. National Union makes much of the fact that it was forced to cover the $1,000,000 coverage gap,[3] but it is not National Union's damages that matter in Count II but IBC's since the claim is based on an assignment of IBC's claims against Westrope. IBC (and therefore National Union) may have been able to claim an injury if it had been responsible for the $1,000,000 gap, but IBC was in bankruptcy and protected from its creditors by virtue of the automatic stay. Only after Sieckman waived all claims against IBC that were not covered by insurance was her case able to proceed. Because IBC sustained no injury, its assignment to National Union of any claims against Westrope, whether valid or not under Missouri law, does not support National Union's claim for damages here. Damage is an essential element of negligence which National Union has failed to prove. Westrope is therefore entitled to judgment as a matter of law on Count II as well.

## IV.    Conclusion

Accordingly, it is hereby ORDERED that

---

[3]As the Court explained above with regard to Count I, National Union's claim for its own damages is dubious given that it paid only $5,000,000 to compromise and settle a verdict on which it would have owed over $6,000,000 even if there had been no gap in coverage.

Case 4:06-cv-00782-NKL   Document 74   Filed 05/23/07   Page 14 of 15

1.    National Union's Motion to Bar the Expert Report of Horst Lechler and Bar

Him from Testifying at Trial [Doc. # 42] is GRANTED;

2.    National Union's Motion for Summary Judgment [Doc. # 44] is DENIED;

3.    Westrope's Motion to Exclude Expert Testimony of Roger Simpson and

Scott B. Lakin [Doc. # 46] is GRANTED as to Lakin and DENIED as

MOOT as to Simpson;

4.    Westrope's Motion for Summary Judgment [Doc. # 47] is GRANTED; and

5.    Both parties Motions in Limine [Docs. ## 61, 62, 63, 64, 65, and 68] are

DENIED as MOOT.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 23, 2007
Jefferson City, Missouri